**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

COOK INLET TRIBAL COUNCIL, INC.,  )
3600 San Jeronimo Drive            )
Anchorage, Alaska 99508,           )
                                   )
            Plaintiff,             )
    v.                             )     Case No. _____
                                   )
CHRISTOPHER MANDREGAN, JR.,        )
Director, Alaska Area Office,      )
U.S. Indian Health Service,        )
4141 Ambassador Drive, Suite 300   )
Anchorage, AK 99508,               )
                                   )
        and                        )
                                   )
ALEX AZAR,                         )
Secretary, U.S. Department of Health )
 & Human Services,                 )
200 Independence Avenue, S.W.      )
Washington, D.C. 20201,            )
                                   )
                                   )
            Defendants.            )
_____    )

**COMPLAINT**

Plaintiff Cook Inlet Tribal Council, Inc., by and through its attorneys Sonosky, Chambers, Sachse, Endreson & Perry, LLP, complains and alleges as follows:

## I.    INTRODUCTION

1.    Pursuant to the Indian Self-Determination and Education Assistance Act (ISDEAA), Cook Inlet Tribal Council (CITC) operates certain federal substance-abuse programs under a contract with the Indian Health Service, an agency within the U.S. Department of Health and Human Services.  On October 5, 2017, the Secretary of Health and Human Services ("the

Secretary") declined CITC's proposed contract amendment under which CITC would be paid certain "contract support costs" for overhead associated with these programs (the "declination finding").

2.      The overhead costs at issue are costs for the facility where CITC's in-patient and outpatient services are provided ("facility support costs").  These are costs for facilities such as an addiction treatment center.  The Secretary admits that facility support costs are a proper reimbursable cost that can be paid through contract support costs under the ISDEAA.  At the same time, the Secretary claims that because the Secretary already paid CITC a small amount of these costs as part of the program funding he paid CITC, the Secretary is under no obligation to pay CITC the balance of these costs.  The Secretary's rejection of the proposal that he pay CITC's remaining facility costs is contrary to law because the ISDEAA commands that the Secretary "shall add" to any ISDEAA contract the "full" amount of a contractor's contract support cost requirement.  25 U.S.C. § 5325(g).

3.      The Secretary's "declination finding" was issued pursuant to 25 U.S.C. § 5321(a)(2).  The ISDEAA's remedial provisions specially authorize this Court to order "immediate injunctive relief to reverse a declination finding under section 5321(a)(2)."  *See* 25 U.S.C. § 5331(a).  CITC now seeks an immediate injunction to reverse the Secretary's declination finding and to order the Secretary to award CITC the additional facility support costs to which CITC is entitled by law.

## II.      JURISDICTION

4.      This Court has jurisdiction over this action pursuant to 25 U.S.C. § 5331(a) of the ISDEAA and 28 U.S.C. § 1331.

## III.    PARTIES

5.      Cook Inlet Tribal Council, Inc. is headquartered in Anchorage, Alaska.  CITC is the Alaska Native tribal health organization designated to provide health care services to beneficiaries of Indian Health Service programs in the Anchorage Area.  CITC qualifies as a "tribal organization" under 25 U.S.C. § 5304(*l*).[1]  CITC is organized as a not-for-profit Alaska corporation.  CITC's Board is controlled by representatives of the following eight federally-recognized Tribes: the Chickaloon Village Traditional Council, the Native Village of Eklutna, the Kenaitze Indian Tribe, the Knik Tribal Council, the Ninilchik Traditional Council, the Salamatof Tribal Council, the Seldovia Village Tribe, and the Native Village of Tyonek.

6.      Alex Azar is the Secretary of the U.S. Department of Health and Human Services (HHS).  Secretary Azar exercises authority delegated to him by Congress to carry out the ISDEAA.

7.      Christopher Mandregan, Jr. is the Area Director of the Indian Health Service (IHS) Alaska Area Office, one of 12 IHS regional offices.  IHS is an agency within the Department of Health and Human Services.  Area Director Mandregan exercises authority delegated to him by the Secretary, through the IHS Director, to carry out the Secretary's responsibilities under the ISDEAA and other applicable law.

8.      As used throughout this Complaint (and unless context commands otherwise), the terms "Secretary," "HHS," "IHS," and "Area Director" are used interchangeably.

---

[1] Unless otherwise noted, all statutory references are to Title 25 of the United States Code.

## IV.  FACTS AND GENERAL ALLEGATIONS

**A.     The Indian Self-Determination and Education Assistance Act's Contracting and Declination Process**

9.      The ISDEAA was enacted to end "the prolonged Federal domination of Indian service programs [that] has served to retard rather than enhance the progress of Indian people and their communities by depriving Indians of the full opportunity to develop leadership skills crucial to the realization of self-government."  § 5301(a)(1).  The ISDEAA sought to achieve this goal by "establish[ing] . . . a meaningful Indian self-determination policy which will permit an orderly transition from the Federal domination of programs for, and services to, Indians to effective and meaningful participation by the Indian people in the planning, conduct, and administration of those programs and services."  § 5302(b).

10.     To execute this goal, the Act mandates that "upon the request of any Indian tribe by tribal resolution" to operate certain agency programs, "the Secretary is directed . . . to enter into" the requested contract with the tribal organization, subject to various terms and conditions. § 5321(a)(1).

11.     Under the Act, a tribal organization "may submit a proposal for a self-determination contract or a proposal to amend or renew a self-determination contract."  § 5321(a)(2).  This action concerns a proposal to amend a self-determination contract to add certain funding to the contract.

12.     Under section 5321(a)(2)(D), when a tribal organization submits a proposal to amend an existing self-determination contract to add a proposed amount of funding, within ninety days of receiving the proposal the Secretary must "approve the proposal and award the contract [amendment] unless the Secretary provides written notification . . . that contains a specific finding that clearly demonstrates that, or that is supported by a controlling legal

4

authority that . . . the amount of funds proposed under the contract is in excess of the applicable funding level for the contract, as determined under section 5325(a)." The process of declining to award a funding amount that has been proposed by a tribal organization is called a declination. 25 C.F.R. §§ 900.20-.33.

**B.     The Indian Self-Determination and Education Assistance Act's Contract Funding Provisions**

13.     Section 5325(a) contains the Act's key funding provisions and establishes the minimum amount of funds to be paid to a tribal organization contracting under the Act. In subsection 5325(g), the ISDEAA directs that "[u]pon the approval of a self-determination contract, the Secretary shall add to the contract the full amount of funds to which the contractor is entitled under [§ 5325(a)]." The model contract in the ISDEAA effectuates these funding provisions by incorporating an "annual funding agreement" under which the Secretary must "make available to the Contractor . . . not . . . less than the applicable amount determined pursuant to [§ 5325(a)]." § 5329(c) (Model Agreement, § (b)(4)).

14.     Section 5325(a) contains two funding mandates. First, section 5325(a)(1) directs IHS to pay "not . . . less than the . . . Secretary would have otherwise provided for the operation of the programs . . . covered by the contract." This funding is the "Secretarial amount" and represents "the amount the Secretary would have expended had the government itself [continued to] run the program." *Arctic Slope Native Ass'n v. Sebelius*, 629 F.3d 1296, 1298–99 (Fed. Cir. 2010), *vacated on other grounds*, 567 U.S. 930 (2012). Second, section 5325(a)(2) mandates that to the Secretarial amount "[t]here shall be added . . . contract support costs."

15.     "Contract support costs" generally include two categories of costs. First, they include additional "direct costs, such as workers' compensation insurance" for certain added contractor costs that are directly supportive of the programs funded with the Secretarial amount.

*Cherokee Nation of Okla. v. Leavitt*, 543 U.S. 631, 635 (2005) (citing § 5325(a)(3)(A)(i)). <u>Second</u>, they include additional "indirect administrative costs, such as special auditing or other financial management costs." *Id.* (citing § 5325(a)(3)(A)(ii)); *see also* § 5304(f) (defining "indirect costs").

16.     IHS generally determines these additional "indirect administrative costs" by reference to a tribal contractor's "indirect cost rate." § 5304(g); IHS, Indian Health Manual [hereinafter IHM], pt. 6, § 3.2E(1) (nonbinding agency "CSC Policy"). An indirect cost rate is calculated by a tribal contractor's "appropriate Federal agency," § 5304(g), also called its "cognizant agency," 2 C.F.R. § 200.19. Generally speaking, an indirect cost rate is the product of dividing (a) all of a contractor's pooled overhead (or administrative) costs by (b) the entire direct cost base for all programs that are supported by those pooled overhead costs. 2 C.F.R. pt. 200, App'x VII, § C(2)(A). Government contractors routinely employ indirect cost rates to account for their expenditure of federal funds. *Rumsfeld v. United Techs. Corp.*, 315 F.3d 1361, 1363 (Fed. Cir. 2003).

17.     IHS generally calculates its payment of indirect contract support costs by multiplying the amount of IHS program funding it pays a tribal contractor—that is, IHS's portion of the direct cost base that is supported by the contractor's pooled administrative costs—by the contractor's indirect cost rate. IHM § 6-3.2E(1). The resulting amount is subject to being reduced if any indirect contract support cost payment would duplicate an amount IHS already paid a contractor as part of the Secretarial amount. IHM § 6-3.2E(3)-(4); *see also* § 5325(a)(3)(A) (duplication provision); S. Rep. No. 103-374, at 9 (1994) ( "In the event the

Secretarial amount under [§ 5325(a)(1)] for a particular function proves to be insufficient in light

of a contractor's needs for prudent management of the contract, contract support costs are to be

available to supplement such sums.").

     **C.**    **CITC's Contract History**

    18.    Since 1992, CITC has contracted with IHS under the ISDEAA to operate various

federal health care programs mostly related to substance-abuse treatment and recovery services.

    19.    Since fiscal year (FY) 1996, CITC has operated its federal IHS programs pursuant

to Contract No. 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 ("Contract").   The Contract states that "[e]ach provision of the

[ISDEAA] and each provision of the Contract shall be liberally construed for the benefit of the

Contractor . . . ."   *See* Contract, § (a)(2).   The ISDEAA contains an identical provision and

requires that all ISDEAA contracts contain this language.   *See* § 5329(c) (Model Agreement, §

(a)(1)(2)); *see also Salazar v Ramah Navajo Chapter*, 567 U.S. 182, 187 (2012) (quoting §

5329(c)).

    20.    The Contract includes CITC's annual funding agreements, which describe the

programs CITC will operate and the funding CITC will receive.   CITC's funding agreements are

incorporated in their entirety into the Contract.   *See* Contract, § (b)(15)(F)(2)(B).

    21.    CITC first contracted with IHS in 1992.   At that time, CITC submitted a proposal

to IHS seeking funds to provide "Primary Residential Treatment at the Alaska Native Alcohol

Recovery Center."   CITC, *Alaska Native Alcoholism Recovery Center Technical Proposal*, at 2

(1992).   In addition to residential treatment, CITC also proposed to continue and improve

"[a]ftercare services to reduce relapse potential and prevent continuing alcoholism and drug

abuse" among the people it serves.   *Id.*   Finally, CITC proposed to provide "[c]ulturally-relevant

treatment to achieve the greatest possible improvement in the over[]all health status and quality

of life of the Alaska Native people" whom CITC serves.  *Id.*  IHS approved and awarded CITC the proposed contract.  CITC's proposed Secretarial amount budget was for $150,000, and within this amount CITC budgeted $6,051 for facilities funding and $5,787.50 to fund a portion of a facilities coordinator's salary.  CITC, *Alaska Native Alcoholism Recovery Center Business Proposal*, at 2 (1992).  These CITC-budgeted items totaled $11,838.50 in facilities-related costs.

22.     In 1992, the overall scope of CITC services supported by the contract with IHS was limited, and primarily covered supplemental recovery services.  By 2017, CITC's IHS-funded contract services covered a full continuum of care including assessment, brief intervention, residential treatment, outpatient treatment, prisoner re-entry assistance and day treatment models, constituting one of the most extensive continuum-of-care recovery programs available anywhere in the State of Alaska.

23.     The final Secretarial amount that IHS paid CITC under CITC's 1992 contract was $185,034.  *See* Letter from Christopher Mandregan, Area Director, IHS, to Amy Fredeen, Executive Vice President, CITC, at 7 n.5 (Oct. 5, 2017) ["Declination Letter"].  At no time since 1992 has IHS ever paid any funding to CITC under CITC's Contract identified as "facility," "facilities," "space," or similar funds classification.  All of IHS's payment documents to CITC under the Contract, from 1992 to the present, show $0 paid in annual "facility," "facilities," "space," or similar funds classification.

24.     CITC's programs have greatly expanded since it first contracted with IHS in 1992.  In addition to the Alaska Native Alcohol Recovery Center (renamed the Ernie Turner Center), CITC now operates a number of outpatient facilities.  In FY 2017, IHS paid CITC the

sum of $2,762,003 in Secretarial amount funding.  Declination Letter at 7 n.5.  This amount is roughly 15 times the size of the treatment programs CITC originally contracted from IHS in FY 1992.

25.     In FY 2017, CITC's indirect cost rate was based (among other costs) on a budgeted $829,704 in pooled facility costs (called "space lease" costs) to carry out all of CITC's programs, including programs funded by IHS and programs funded by other agencies (such as the Department of the Interior's Bureau of Indian Affairs).  Of this total amount, IHS calculated that $489,386 in facilities costs are allocable to IHS.  *See* Declination Letter at 7 n.4; *id*. Exh. 10, at 1.  This allocation reflects IHS's computation that IHS's portion of the direct cost base is 58.983% of the total direct cost base supported by CITC's indirect cost pool, making IHS responsible for 58.983% of each component of CITC's indirect cost pool.  *Id.*  IHS calculated that "IHS programs were associated with $489,386 of CITC's reported $829,704 in [indirect] space lease cost[s] for FY 2017."  *Id.*

26.     In the facts giving rise to this action, IHS has refused to add to the Contract the foregoing $489,386 in indirect contract support costs.  *Id.* at 9.

D.     **The Disputed Indirect Contract Support Cost Requirement**

27.     By letter dated July 12, 2017, as subsequently adjusted by letter dated September 18, 2017, CITC proposed that IHS pay CITC the sum of $489,386[2] as IHS's share of CITC's pooled facility costs for FY 2017.  CITC agreed to a duplication offset of $11,838.50 against this amount, but no more.

---

[2] Although CITC's original calculation came to $489,466, IHS's recalculation came to $489,386. For purposes of this action, CITC accepts IHS's recalculation of the agency's share of CITC's pooled facility costs.  *See* ¶ 25, *supra*.

28.     By letter dated October 5, 2017, IHS declined to add the contested funds to CITC's Contract.  IHS made two principal assertions.  First, IHS asserted that the $11,838.50 CITC budgeted in 1992 for facility costs, and which IHS paid to CITC in 1992 as part of the Secretarial amount, had increased over the years to "at least $157,814" in FY 2017.  IHS made this assertion by pointing out that the total value of the Contract had increased from 1992 to 2017.  *See* Declination Letter at 7 n.5.  Second, IHS asserted that CITC was in any event not entitled to facility support costs because facility costs are "normally" paid by IHS out of its direct operation of a program.  *Id*. at 8.  On these twin grounds, Mr. Mandregan concluded that "the amount of funds proposed under the contract is in excess of the applicable funding level for the contract."  *Id*. at 1 (quoting § 5321(a)(2)(D)).

29.     CITC's pooled facility (space) costs were actually incurred and were prudent and reasonably necessary to carry out the client treatment programs covered by CITC's Contract with IHS.  At no time did IHS's declination letter allege that the subject facility (space) costs were not actually incurred by CITC.  At no time did IHS's declination letter allege that the subject facility (space) costs were not prudent to carry out the client treatment programs covered by CITC's Contract with IHS.  At no time did IHS's declination letter allege that the subject facility (space) costs were not reasonably necessary to carry out the treatment programs covered by CITC's Contract with IHS.

## V.  CAUSE OF ACTION
### (Failure to Award Contract Amendment For Additional Facilities Support Funding)

30.     CITC incorporates all previous allegations of fact and law into this Cause of Action.

31.     This action challenges IHS's refusal to pay $489,386 in administrative facility support costs based upon the wrongful assertion that to pay such costs would entirely duplicate

amounts IHS already paid CITC. The Secretary's ISDEAA regulations provide that facility costs can be paid for "under [§ 5325(a)] as direct *or indirect* charges to a self-determination contract," 25 C.F.R. § 900.73 (emphasis added), and in FY 2017 (as in FY 2016) CITC proposed that IHS cover these costs as indirect costs.

32.     In any civil action challenging the Secretary's declination of a proposed contract amendment, the ISDEAA provides that "*the Secretary shall have the burden of proof* to establish by *clearly demonstrating the validity of the grounds* for declining the contract proposal." § 5321(e)(1) (emphasis added).

33.     The Secretary cannot carry this high burden of proof to defend the validity of his declination finding. The claimed $489,386 does not duplicate the Secretarial amount. IHS has never identified any portion of the Secretarial program amount it paid CITC as facility support funding. The closest document in the record is a budget document prepared by CITC in 1992 proposing to spend $11,838.50 that year out of the Secretarial amount on facility costs. Today, 26 years later, the parties agree that CITC's facility costs allocable to the IHS Contract totals $489,386. The $11,838.50 CITC budgeted out of the 1992 Secretarial amount is the only sum that IHS has paid toward those facility costs. That amount was and remains today wholly insufficient for CITC to prudently manage its Contract with IHS in 2017. The amount sought in the contract amendment for 2017 does not entirely duplicate whatever IHS paid in 1992 toward facility costs as part of the Secretarial amount. *See* § 5325(a)(3); S. Rep. No. 103-374, at 9.

34.     The facility costs CITC requested do not exceed the "applicable funding level" for the contract under subsections 5325(a)(2) and (3) because CITC is entitled to receive funding for "facilities support costs to the extent not already made available." IHM § 6-3.2D(1)(e). At most only $11,838.50 has been made available to CITC for facilities costs, and CITC has already

accounted for that credit in its funding proposal.  Letter from Gloria O'Neill, President & CEO, CITC, to Christopher Mandregan, Area Director, IHS, at 1 (Sept. 18, 2017).  Therefore, CITC is entitled to the balance of the $489,386 in facilities costs allocable to CITC's Contract with IHS. Under section 5325(g) of the ISDEAA, this amount must by law be added in "full" to CITC's contract because "[u]pon the approval of a self-determination contract, the Secretary shall add to the contract the full amount of funds to which the contractor is entitled under [§ 5325(a)]."

35.    IHS has failed to satisfy the burden of proof it carries under section 5321(e)(1) to justify the rejection of CITC's contract proposal for additional facility support funds.  IHS has failed to "clearly demonstrat[e] the validity" of the proffered justifications set forth in Mr. Mandregan's decision declining to award the $489,386 at issue.

36.    The Area Director alleged that facilities support costs had already been provided "as part of CITC's program base" (*i.e.*, as part of the Secretarial amount).  Letter from Christopher Mandregan, Area Director, IHS, to Amy Fredeen, Executive Vice President, CITC, at 2 (July 7, 2014).  But, the Area Director never clearly demonstrated precisely what portion of the $150,000 paid under the original 1992 Contract covered facility costs.  Nor did he clearly demonstrate precisely what portion of the sums paid in 2017 covered facility costs.  Instead, the Area Director referred to a Business Proposal created *by CITC* in 1992 when CITC first sought to contract for these funds.  The Secretary cannot lawfully take an amount placed by a tribal contractor's budget into a category, claim that category as its own, and then unilaterally declare that the agency has over the years increased that category of funding simply because *total* program funds have increased over time.

37.     Put differently, the Secretary cannot successfully carry his burden by claiming that, since facility costs budgeted in 1992 totaled $11,838.50, and because mathematically that sum equals 7.888% of CITC's total 1992 contract with IHS, all future funding paid to CITC implicitly includes 7.888% in facility funding.

38.     The Secretary also cannot successfully carry his burden by arguing that if a cost were "normally" paid by IHS out of its direct operation of a program, then such a cost is *never* eligible for payment as an item of contract support costs.   The position is absurd because it would mean that the Secretary need not actually have paid *any* sums toward a particular cost in any given contract, so long as he makes the case that the agency "normally" would have paid that cost out of IHS's program budget.   It also would render meaningless the ISDEAA's no-duplication provision, § 5325(a)(3), a provision which only makes sense if there exist potentially overlapping categories of costs between the Secretarial amount and the contract support cost amount.   That is, if there were never common and overlapping categories, there would never be a risk of duplication and the statutory provision would be meaningless.

39.     IHS has acted unlawfully in failing to award CITC's proposed contract amendment for additional indirect contract support costs.   Mr. Mandregan has not "clearly demonstrate[ed] the validity of the grounds for declining the contract proposal."   § 5321(e)(1).

40.     The ISDEAA confers upon a tribal contractor a special statutory right to immediate injunctive relief to reverse a declination finding and to compel the Secretary to award and fund an approved self-determination contract, including mandamus to compel a United States officer or agency to perform a duty provided under the ISDEAA.   § 5331(a).   Because an injunction is specially authorized by statute, the factors applicable to equitable injunctions (such as relative balance of harms and the public interest) do not apply.

41.     IHS's refusal to award CITC's proposed contract amendment to add additional funds to cover IHS's share of CITC's administrative (or indirect) facility costs is contrary to law. CITC is entitled to immediate injunctive relief directing the Secretary to award the contract amendment as proposed and to award CITC $489,386 in additional contract support cost funding.

## VI.     RELIEF REQUESTED

WHEREFORE, the Cook Inlet Tribal Council prays that this Court grant the following relief:

A.     A declaratory judgment that the Secretary acted in violation of the ISDEAA by declining to approve and award CITC's contract amendment for additional indirect contract support costs;

B.     An immediate injunction compelling IHS to enter into the proposed contract amendment awarding CITC additional indirect contract support cost funds in the amount of $489,386, and to compel the immediate payment of these funds;

C.     Costs and attorneys' fees incurred in pursuing these claims, including the appeal before this Court, as provided for under the Equal Access to Justice Act, 5 U.S.C. § 504; 25 U.S.C. § 5331(c); 28 U.S.C. § 2412, and other applicable law; and

D.     Such other monetary, declaratory and equitable relief as this Court may find to be equitable and just.

///

///

///

///

14

Respectfully submitted this 19th day of March 2018.

SONOSKY, CHAMBERS, SACHSE,
ENDRESON & PERRY, LLP

*/s/ Lloyd B. Miller*

By:_____

Lloyd B. Miller
D.C. Bar No. 317131
Donald J. Simon
D.C. Bar No. 256388
1425 K Street, N.W., Suite 600
Washington, D.C. 20005
Telephone: (202) 682-0240
Facsimile: (907) 682-0249
lloyd@sonosky.net
dsimon@sonosky.com

Rebecca A. Patterson
*pro hac vice pending*
Alaska Bar. No. 1305028
Illinois Bar No. 630987
Whitney A. Leonard
*pro hac vice pending*
Alaska Bar. No. 1711064
Montana Bar No. 36409732
725 East Fireweed Lane, Suite 420
Anchorage, AK 99503
Telephone: (907) 258-6377
Facsimile: (907) 272-8332
rebecca@sonosky.net
whitney@sonosky.net

Attorneys for Plaintiff Cook Inlet Tribal
Council, Inc.